THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARCHIE SMITH, Defendant-Appellant.

First District (1st Division)    No. 76-268

Opinion filed September 19, 1977.

Thomas F. Geraghty, of Northwestern Legal Assistance Clinic, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Myra J. Brown, and Richard J. Barr, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

After a jury trial, Archie Smith (defendant) was found guilty of murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1) and of attempt armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 8—4). He was sentenced to 50 to 100 years and he appeals.

In this court, defendant advances eight contentions, some of which consist of a number of separate points. His arguments raise issues regarding polling of the jury; final argument of the prosecution; defendant's motion to suppress statements; quality of his legal representation; instructions to the jury; severity of punishment and proof beyond a reasonable doubt.

We wish to make a general statement concerning this appeal. Defendant's brief is 94 pages and cites approximately 100 cases. The State's brief consists of 146 pages, citing more than 160 authorities. In addition, defendant has filed a reply brief of 52 pages, citing and attempting to distinguish more than 60 cases. This process of citing and distinguishing cases is thus attenuated to such an inordinate and unnecessary extent that it threatens to extend to the outer reaches of infinity and beyond. Considerations of space and time prevent us from dealing with this unmanageable welter of authorities. We have, therefore, contented ourselves with relying upon established legal principles and with citing the cases which support them.

Defendant filed two pretrial motions to suppress his confession. His brief argues only that the confession was involuntary because of

insufficiency of *Miranda* warnings. The trial court conducted a hearing on this issue. The only testimony received was from police officers, an assistant State's Attorney and the court reporter. The totality of this evidence is that defendant was given proper *Miranda* warnings by the police and by the assistant State's Attorney on at least four different occasions. The details of two of the warnings are set out in written statements made by defendant to the assistant State's Attorney.

In a situation of this type the frequently stated legal principles are clear. This court may not disturb the result reached by the trial court unless it is contrary to the manifest weight of the evidence. (See *People v. Torres* (1973), 54 Ill. 2d 384, 392-93, 297 N.E.2d 142; *People v. Burbank* (1972), 53 Ill. 2d 261, 266-67, 291 N.E.2d 161, *cert. denied*, 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017; *People v. Luckett* (1977), 48 Ill. App. 3d 536, 541-42, 362 N.E.2d 1297, and authorities there cited.) We find specifically that the voluntary nature of the confessions here is overwhelmingly proved by the evidence.

Defendant's argument is directed to the fact that the assistant State's Attorney first spoke to defendant and gave him the warnings. He then spoke to defendant regarding his desire for counsel. The statements made by the defendant at that time are completely ambiguous. Defendant stated, "I am not saying I don't want to make a statement"; "I'd like to reserve the right to make a statement to you at this time pending some counseling"; "You know, because as I explained there was litigation [*sic*] between the two detectives and myself." At this point the assistant State's Attorney terminated the questioning and left the room. He testified that at that moment defendant shouted to him, "I told you I wanted to give you a statement without my lawyer here, but I didn't want to be charged with murder."

However, defendant immediately asked a policeman who remained in the room to recall the attorney. Defendant told the officer that he did not want to be charged with murder, he did not need any attorney present and he wished to speak to the assistant State's Attorney. Accordingly, some 4 minutes later, the assistant State's Attorney returned to the room and again gave defendant a statement of his *Miranda* rights. A court reporter's transcription of this interview shows a clear and complete statement of these rights and reflects that defendant persisted in his desire to make a statement without an attorney present. We add that defendant also stated during the subsequent interview that he had attended college for 3 years.

■■ We find this situation governed by *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, affirming the decision by this court of *People v. Morgan* (1976), 39 Ill. App. 3d 588, 350 N.E.2d 27. The supreme court

analyzed *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, and, applying the reasoning of that authority, held that an initial request for an attorney may be voluntarily withdrawn. In the record before us it is extremely doubtful as to whether defendant ever expressed a desire for counsel. He reiterated his desire to obtain leniency in exchange for a statement. He asked if he could do so by implicating his accomplice. He expressly placed significance upon the question of "who actually pulled the trigger." The attempt by defendant to differentiate *Morgan* is unacceptable. Defendant urges that he never recanted his desire for a lawyer and was never advised that he could have counsel present during the questioning. The record is completely to the contrary. We affirm the ruling of the trial judge concerning the voluntary nature of the statements made by defendant.

Turning to the issue of proof beyond reasonable doubt, a witness for the State attended a late evening motion picture performance in a shopping plaza on the south side of Chicago with several of her friends. She noticed two men standing in the lobby close to the door of the manager's office. No other persons were present at that time. She heard a "pop", then a scream from the manager, saw him fall to the floor and saw the two men running away from his office. She gave the police general descriptions of these men and their clothing. She stated that one of them was carrying a bag of some type. It appeared to her that one of the men, who was black, carried a pistol. She noted them because, "[T]hey didn't seem to have a purpose."

A number of police officers testified. Two of them entered the theater after hearing a radio message. They saw the manager dead on the floor outside his office. He was covered with blood. There were holes in the front and rear of the body. They also noticed a laceration on the left side of the head. They picked up a spent shell casing close to the body and a spent bullet on the office floor.

The police checked the immediate area and spoke to a citizen. Five minutes later this citizen saw a man running across the street and then walking quickly, looking over his shoulder. She also saw a police car approaching rapidly. She testified that the man walked up to a porch on Seeley Avenue and attempted to open the door. He then threw an object into an adjoining vacant area. At this point the police car which she had seen earlier stopped at the porch and the man was placed under arrest. She saw the police officers enter the vacant lot and return to the front of the house carrying a gun. Police officers from the squad car testified to having seen this man run across 96th Street in the immediate vicinity and then approach the porch, stop and throw an object into the vacant lot. Defendant was identified by police testimony as being the man who had

thrown the gun into the lot. Police retrieved the gun and it was received in evidence. It was a Star blue 9-millimeter automatic pistol fully loaded and cocked.

There was police testimony that when defendant was arrested he was perspiring and short of breath. His clothing was in disarray and some foliage and leaves were adhering to his shirt. He was wearing a white and blue shirt which corresponded to the description given to police by the young theater patron.

Early next morning other police officers were summoned to a home in the same general area. A citizen resident gave the officers a light-brown man's handbag, a box containing bullets and additional items not material here. She found this property in the driveway adjacent to her home. The officer then went to a nearby restaurant where he arrested a man identified as Joseph Collins, a coindictee of defendant, not involved in the trial or in this appeal. The police described Collins as a black man and in other details approximating the description given by the theater patron. After speaking with Collins that evening, a police officer searched the rear yard of another residence in the area and found a Browning 9-millimeter blue automatic pistol which had been hidden beneath foliage.

Forensic evidence described the head laceration of the deceased as less than 1 inch long, patently the result of trauma from a gun butt moving in a downward direction. In the opinion of the medical expert, the Browning pistol found behind the residence on Leavitt Street, or a gun like it, caused the laceration rather than the pistol found in the vacant lot at the Seeley Avenue address. The medical expert testified that there were two wounds on the body, one evidencing entrance and another exit of a bullet. This bullet wound resulted in major internal bleeding and was the cause of death.

Qualified ballistics evidence was that the spent bullet found in the manager's office had been fired from the Star automatic pistol found in the vacant lot on Seeley Avenue. The expended cartridge case found in the office could have been ejected only from this same Star automatic pistol. In the opinion of the expert, neither the bullet nor the cartridge case had come from the Browning pistol found behind the residence on Leavitt Street.

In addition to the above evidence, when defendant was in police custody he gave two written statements to an assistant State's Attorney. Both of them were taken in shorthand, transcribed by the court reporter and read into evidence. The first of these statements contains primarily background information and discussion between defendant and the attorney regarding the type of charges which might possibly be filed. The second statement pertains to defendant's guilt. Defendant stated that Collins and a lady named Adrienne Taylor came to visit him on the

evening of July 19, 1973. She remained in a car and Collins spoke to defendant. Collins told defendant about a possible armed robbery. Collins had three loaded 9-millimeter automatic pistols carried in a brown leather purse with shoulder strap. Collins told defendant that the girl would drive the car for them.

The statement continued to the effect that Collins told defendant to guard the door of the theater in the shopping plaza. They drove to the plaza and parked the car about 75 to 100 yards from the theater. Collins went in first to check the lobby. He then signaled defendant to enter. The guns had been distributed to the three participants. Defendant and Collins entered the washroom. Collins told defendant to guard the front of the theater and not let anyone in or out. The statement described the manager's office as three-sided with an open front. Defendant went to the door and Collins entered the office and pulled the gun from his belt. Defendant heard the manager state that he had no money. Collins struck the manager with the gun on the side of the head. As the manager fell, he called for help. Collins started moving back then fired the pistol. Collins was then from 5 to 10 feet from the victim.

Defendant further stated that he then ran out of the door and saw three or four people standing near a staircase. He told them to run and then ran down the stairs and across the parking lot. He could hear Collins behind him. They both ran together across the street and down an alley. Defendant gave the gun back to Collins when they were some 4 blocks away and Collins put it into the bag. A police car came into view and Collins ran away over some hedges. Defendant started to walk up the stairs of the Seeley Avenue residence. He was arrested by the police. He denied that he had ever fired the gun of which he had possession during the incident. The statement reflected that it was made by defendant simply in order to tell the truth, not because of promises or the use of force.

The defendant's statement corroborates all of the remaining evidence of guilt with one exception. The forensic evidence is that the deceased was struck with the butt of the Browning gun found behind the residence on Leavitt Street while the ballistics evidence is that the fatal bullet was fired from the Star automatic found in the vacant lot on Seeley Avenue. In his statement defendant said that he did not abandon a gun; he did not strike the victim with either gun; he did not fire either gun and was not in the manager's office when Collins fired the fatal shot. The only logical solution to defendant's disclaimer of firing or abandoning a gun is that it is simply an attempt to place the blame for the actual shooting upon Collins.

However, this attempt was ill-conceived. Since defendant concedes that he cooperated with Collins in the plans for the armed robbery and was an active participant therein, defendant would be criminally

responsible for the murder on the theory of accountability even though he did not actually fire the fatal shot. (See *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, and *People v. Tate* (1976), 63 Ill. 2d 105, 345 N.E.2d 480.) Even the nonprosecution or acquittal of the person who committed the offense would not be a bar to successful prosecution of the defendant on the theory of accountability. See *People ex rel. Scott v. Master Barbers & Beauty Culturists Association* (1973), 9 Ill. App. 3d 981, 987, 293 N.E.2d 393.

■■ In our opinion, a simple reading of the evidence is sufficient refutation of defendant's claim regarding absence of proof beyond reasonable doubt. It is true that the young theater patron made no in-court identification of defendant; however, her general description of the two offenders and of their actions is supported by the record. The forensic and ballistics evidence fully support the guilty verdict. The police testimony regarding defendant's flight and their observation of his conduct in discarding the loaded pistol links with the ballistics evidence. The detailed confession corroborates all of this evidence with the single exception above pointed out. In our opinion, the evidence before us is sufficient to constitute strong proof of guilt beyond any reasonable doubt. *People v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 562, 97 S. Ct. 1600.

The argument by the prosecution to the jury is reflected in some 35 pages of the transcript. Defendant has culled some 13 portions of the argument which he now claims to be prejudicial. We will state them in numbered order:

(1) The prosecutor stated that defendant "is basically not sorry."

(2) The prosecution need not raise their voices and shout because "the silent witness in this case" cries out in outrage.

(3) The testimony that ties defendant to the murder weapon is there and it exists and "it can't be denied."

(4) The evidence of the prosecution is "uncontradicted and undenied."

(5) The defense was trying to tell the jury "that the gun magically appeared in the yard where Smith was arrested, if Smith didn't throw it there * * * how did it get there?"

(6) The defense attorney told the jury that a bullet remained in the theater wall and "it is there today. You mean to say a lawyer worth his salt is going to leave that, what he believes to be an important bullet in that wall, if it's really there?"

(7) The defendant attempted "once again to bargain or deal for himself, try and shift his responsibility to others, criticize and condemn others, to draw your attention to people like Joseph Collins [codefendant]. * * * Now isn't that a smoke screen?"

(8) The defendant's statement included "half truths" where defendant

was "trying to get away with telling the untruth, putting it on Collins."

(9) The jury should read the defendant's statements which were a "bundle of half truths."

(10) Based on the evidence the jury has "for the first time and hopefully the last in your life seen the face of a murderer."

(11) The defendant must attack the testimony that ties him to the murder weapon but, "it's there, it can't be denied, it exists so he calls it built evidence—it is not built evidence."

(12) The jury will ask themselves, "Is that testimony supported by any physical evidence, evidence that cannot lie? Evidence that cannot be impeached? Although our witnesses were not either is it supported by physical fact?"

(13) This claim is a repetition of item 5 above; claimed to be prejudicial for other reasons.

Certain general considerations must first be mentioned. The Supreme Court of Illinois has stated the first of these principles as follows (*People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324):

> "The character and scope of argument to the jury is left very largely to the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. (*North Chicago Street Ry. Co. v. Cotton*, 140 Ill. 486.) The general atmosphere of the trial is observed by the trial court, and cannot be reproduced in the record on appeal. The trial court is, therefore, in a better position than a reviewing court to determine the prejudicial effect, if any, of a remark made during argument, and unless clearly an abuse of discretion, its ruling should be upheld. (*City of Chicago v. Chicago Title & Trust Co.*, 331 Ill. 332.)"

We cannot say that any of these above 13 items, or all of them together, constitute the type of prejudicial argument which requires reversal of a conviction. Defendant cites and relies upon cases such as *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, and *People v. Stock* (1974), 56 Ill. 2d 461, 309 N.E.2d 19, as examples of prejudicial final argument. But, comparison of those situations with the case at bar serves only to reinforce our opinion that the record before us does not reflect the type of prejudicial argument which requires reversal.

■■ We note also that in *Weathers* three justices of the supreme court dissented on the theory that in view of "the strong evidence of guilt" the arguments there in question did not alter the verdict or actually prejudice the defendant. (62 Ill. 2d 114, 122.) The dissent on this theory is supported by the principles that no prejudicial error results from final argument unless it constituted " 'a material factor in the conviction * * *' "(*People v. Clark* (1972), 52 Ill. 2d 374, 390, 288 N.E.2d 363, quoting *People v.*

*Swets* (1962), 24 Ill. 2d 418, 423, 182 N.E.2d 150), resulted in "substantial prejudice to the accused" (*People v. Nilsson* (1970), 44 Ill. 2d 244, 248, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881), or "the verdict would have been different had the improper closing argument not been made * * *" (*People v. Trice* (1970), 127 Ill. App. 2d 310, 319, 262 N.E.2d 276). Finally, we must consider the fact that "both the court and counsel admonished the jury that counsel's remarks did not constitute evidence." (*People v. King* (1977), 66 Ill. 2d 551, 559, 363 N.E.2d 838.) As above pointed out, the evidence in the case before us is strong and convincing beyond any reasonable doubt. All of these factors impel us to the conclusion that none of the matters pointed out in defendant's brief pertaining to closing argument constitute reversible error.

■■ Other reasons support this conclusion. No objection was made by defendant to 11 of the items above mentioned. Defendant objected generally to item No. 1 but the trial judge, we think correctly, brushed aside this objection and directed that the argument proceed. An objection was made to item No. 10. The court sustained the objection and the assistant State's Attorney moved to another subject. As to each and all of the remaining items, the objection must be deemed waived. In *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 22, 337 N.E.2d 454, *appeal denied* (1976), 61 Ill. 2d 604, we cited the cases holding that "allegedly prejudicial argument will not be considered in the absence of an objection." We also cited there the exception to this rule. In the absence of an objection improper remarks will be considered only if we are able to say they were " ' * * * so prejudicial that defendant did not receive a fair trial or were so flagrant as to threaten deterioration of the judicial process.' " (*Witherspoon*, 33 Ill. App. 3d 12, 22, quoting *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.) The exception is patently not applicable to the case before us.

Additional specific comments are proper here. The first four of the above items are generally concerned with statements by the prosecutor that his case was uncontradicted or undenied. In *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, 284 N.E.2d 283, the prosecutor told the jury seven times that certain testimony was "uncontradicted." The conviction was affirmed. Our recent opinion in *People v. Summers* (1977), 49 Ill. App. 3d 70, 77-78, 362 N.E.2d 1347, reached the same result with reference to a similar argument.

In at least one instance (item No. 6 above), the allegedly prejudicial argument was proper response to a statement by defense counsel. Defense counsel asserted, without support from the record, that there was a bullet remaining embedded in the theater wall. This was an attempt to overcome ballistics evidence that the fatal bullet found on the floor had

come from the gun discarded by defendant. In response, the assistant State's Attorney made the remarks above summarized in item 6. In our opinion this was a fair response to the unsupported argument of defense counsel. (*People v. Norfleet* (1973), 15 Ill. App. 3d 567, 572, 304 N.E.2d 672.) The same theory is applicable to item No. 13 which is the same as item No. 5.

In item No. 7, the remarks made by the prosecution are comments which are justified by the record. Any reasonable person considering all of the evidence in this case and reading the defendant's confession might well reach the same conclusion. The remark concerning the smoke screen has frequently been used in final argument. See *People v. Palmer* (1970), 47 Ill. 2d 289, 299-300, 265 N.E.2d 627, *cert. denied* (1971), 402 U.S. 931, 28 L. Ed. 2d 866, 91 S. Ct. 1532.

■■ Defendant urges that items 8 and 9 are prejudicial because they are expressions of opinion regarding defendant's guilt. Defendant qualifies his argument by the correct statement that such expressions of opinion are proper where they are based upon the evidence. In the case before us, the contradiction between one portion of defendant's confession and the physical and other evidence was manifest. The remark of the prosecutor was based upon the evidence and therefore was fully justified. Compare *People v. Anthony* (1976), 41 Ill. App. 3d 1025, 1029-31, 355 N.E.2d 218; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 22; *People v. D'Angelo* (1975), 30 Ill. App. 3d 86, 91-92, 333 N.E.2d 525, *appeal denied* (1975), 61 Ill. 2d 598.

Defendant criticizes items Nos. 11 and 12 on the ground that they are in effect unsworn testimony by the prosecutor. We disagree. Item No. 11 was justified as an attempt to meet statements by defense counsel. The words "built evidence" were used by the defense attorney as description of the State's case. The language of the prosecutor in item No. 12 is ambiguous to the point of being virtually devoid of meaning. In any event, the remarks were not prejudicial.

In this section of the argument, defendant finally urges that it was the duty of the trial court to take affirmative action and prevent additional prejudice from improper argument. Defendant cites *Weathers*, 62 Ill. 2d 114, and *Stock*, 56 Ill. 2d 461, which are above considered. This record reflects no such situation. The trial judge conducted these proceedings with understanding and ability and in a most exemplary manner. The defendant received a fair trial and there was no need for the trial judge to take affirmative action.

Over the objection of defendant, the trial court gave an instruction tendered by the People which stated that the defendant had made a confession of facts; it was for the jury to determine if he made the confession and if so what weight should be given to it. The jury was

further told that in determining the weight to be given to a confession they should consider all of the circumstances under which it was made. (Illinois Pattern Jury Instruction, Criminal, No. 3.07 (1968) (hereinafter cited as IPI Criminal).) Defendant urges that the statement made by him was not a confession so that giving the instruction was reversible error.

Undoubtedly there is a legal difference between a confession and a statement. "Actually an admission is not a complete acknowledgment of guilt as is a confession. A confession has been defined as 'a comprehensive admission of guilt or of facts which necessarily and directly imply guilt.'" *People v. Tennant* (1975), 32 Ill. App. 3d 1034, 1045, 337 N.E.2d 322, *aff'd on other grounds* (1976), 65 Ill. 2d 401, 358 N.E.2d 1116, quoting *People v. Rollins* (1970), 119 Ill. App. 2d 116, 131, 255 N.E.2d 471, *appeal denied* (1970), 43 Ill. 2d 398; see also *People v. King* (1963), 29 Ill. 2d 150, 155, 193 N.E.2d 790.

■■ In the instant case, there were three indictments against defendant charging murder. One was for killing the deceased with a gun without lawful justification (Ill. Rev. Stat. 1971, ch. 38, par. 9—1), one for shooting the deceased knowing that this created a strong probability of death or great bodily harm (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a-2)), and the third was for killing the deceased while attempting to commit the forcible felony of armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a-3)). There was also a fourth indictment charging attempt armed robbery (Ill. Rev. Stat. 1971, ch. 38, par. 8—4). The defendant as well as his accomplices Joseph B. Collins and Adrienne Taylor were charged in all four of these indictments. Therefore, it is apparent that the last written statement which defendant made to the assistant State's Attorney was a full and complete confession to murder on the theory of accountability. It follows that the assailed instruction was not erroneous.

After the jury verdict had been read, counsel for defendant requested that the jury be polled. The right to a poll of the jury has been described as "substantial." (See *People v. Herron* (1975), 30 Ill. App. 3d 788, 791, 332 N.E.2d 623, *appeal denied* (1975), 61 Ill. 2d 599.) The court immediately proceeded with the poll. The record shows the following with reference to the question put to the ninth juror:

"The Clerk: Joe Lucas, were these your verdicts, are they now your verdicts?

Mr. Lucas: (no response)

The Court: Will you answer the question?

The Juror: May I—

Mr. DeJohn [assistant State's Attorney]: Mr. Clerk, will you read the question, if you will?

The Clerk: Were those your verdicts, are they now your verdicts, sir?

Mr. Lucas: According to the papers, yes.

The Court: Proceed.

Mr. Deppe [Defense Attorney's Clerk]: I am sorry, I didn't hear the answer.

(Whereupon the answer was read by the reporter as hereinabove transcribed.)

The Court: Proceed."

The poll was then completed without further incident and the jury was dismissed. Thereafter counsel for defendant moved the court for a mistrial which was denied. Defendant depended upon this incident as part of his motion for new trial which the trial court denied.

The record shows simply what transpired at the time of the taking of the poll. No further evidence was introduced at any time by either side. Defendant states in his brief, however, that the prosecutor left his seat during the polling, walked in the direction of the juror who was being questioned and took a position between the juror and the defense table. Statements to this effect were made by counsel for the defendant at the hearing on the motion for new trial. But, defendant's counsel who argued the motion for new trial was not personally present at the taking of the poll. Furthermore, the statements of counsel are not evidence and may not be used as a vehicle for attempted expansion of the record. The validity of defendant's contention in this regard will be determined by us from the record and from no other source.

Perhaps the most pertinent authority here is *People v. Massie* (1972), 5 Ill. App. 3d 432, 283 N.E.2d 293, where, upon being polled, a juror stated, "I pleaded guilty, yes." This court held that the mere fact that the juror used the words "I pleaded guilty" immediately before his affirmative answer would "not detract in the least from the jury's unanimity." (5 Ill. App. 3d 432.) In the case before us, the precise answer of the juror was, "According to the papers, yes." In our opinion the initial clause in this response neither affects nor diminishes the efficacy of the affirmative response. The situation in the instant case is thus far different from *People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, 292 N.E.2d 124, in which the juror actually made a negative response on the poll by responding, "Well, it wasn't exactly, no." (9 Ill. App. 3d 209, 210.) *Harvey* is distinguished in *People v. Gardner* (1976), 40 Ill. App. 3d 700, 703-04, 352 N.E.2d 448, *appeal denied* (1976), 64 Ill. 2d 597, which is another case contrary to defendant's contention.

In *People v. Herron* (1975), 30 Ill. App. 3d 788, 791, 332 N.E.2d 623, *appeal denied* (1975), 61 Ill. 2d 599, upon the poll the foreman responded, "It wasn't, but it is." This court affirmed the conviction. The verbiage appearing immediately before the affirmative response was held to be of no effect. As we stated in *Herron,* "The unanimity of the verdict is

not destroyed merely because a juror's response is unorthodox. The real question is whether the court, upon hearing the juror's response, reasonably believes that the juror has freely assented to the verdict." 30 Ill. App. 3d 788, 791.

In *People v. Hill* (1973), 14 Ill. App. 3d 20, 22, 302 N.E.2d 373, the juror initially responded, "No. No, sir." Defense counsel repeated this answer. The court stated that he did not hear the reply and asked the question again. The juror then answered affirmatively. At the request of counsel, the question was put to this juror once more at the end of the poll. The juror again said "Yes." This court found no error in the poll even though, quite in contrast to the case at bar, the juror actually first gave a negative response and then answered the question affirmatively.

■■ The basic purpose of the poll is not to obtain an articulate or immediate response from every juror but to determine whether the verdict has in fact been freely reached and remains unanimous. In *Hill*, this court pointed out that hesitation by a juror tends only to demonstrate "that the juror was careful about her answer." (14 Ill. App. 3d 20, 22.) The authorities stress the point that the trial court is in the best position to determine whether the juror has freely assented to a verdict. In *Herron*, this court cited authority to the effect that, "The trial court is in the best position to determine this question because it not only hears the juror's responses but also can observe the juror's demeanor and tone of voice." 30 Ill. App. 3d 788, 792.

■■ In the case before us, when the trial court denied the motion for new trial, the court stated that it was "relying on the court's own observation in connection with this case." We cannot conclude under any circumstances that the result thus reached by the trial court was "clearly unreasonable." *Herron*, 30 Ill. App. 3d 788, 792.

■■ Defendant devotes a great deal of time and space to urging incompetency of his privately retained trial counsel. Defendant cites *United States ex rel. Williams v. Twomey* (7th Cir. 1975), 510 F.2d 634, which holds that, "The criminal defendant, whether represented by his chosen counsel, or a public agency, or a court-appointed lawyer, has the constitutional right to an advocate whose performance meets a minimum professional standard." (510 F. 2d 634, 640.) In a case involving the services of privately retained counsel, the Supreme Court of Illinois requires that defendant may not complain "unless the representation was so inadequate as to reduce a proceeding to a farce * * *" (*People v. Fleming* (1971), 50 Ill. 2d 141, 145, 277 N.E.2d 872). Our supreme court has also held that in a case involving a court-appointed attorney from a public agency, "in order to warrant a reversal because of incompetency of counsel the defendant must establish actual incompetence as reflected by the representation and substantial prejudice resulting therefrom."

*People v. Witherspoon* (1973), 55 Ill. 2d 18, 21, 302 N.E.2d 3. See also *People v. Ortiz* (1974), 22 Ill. App. 3d 788, 795, 317 N.E.2d 763.

This court is not bound to follow decisions of the United States Courts of Appeal (*People v. Stansberry* (1971), 47 Ill. 2d 541, 544, 268 N.E.2d 431, *cert. denied* (1971), 404 U.S. 873, 30 L. Ed. 2d 116, 92 S. Ct. 121; *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F. 2d 1072, *cert. denied*, 402 U.S. 983, 29 L. Ed. 2d 148, 91 S. Ct. 1658). We prefer to and will follow the decisions of the Supreme Court of Illinois. As pointed out in *Fleming*, " 'any other rule would put a premium upon pretended incompetence of counsel * * *' " and, " '* * * a lawyer with a desperate case would have only to neglect it in order to insure reversal or vacation of the conviction.' " (50 Ill. 2d 141, 145, quoting *People v. Stephens* (1955), 6 Ill. 2d 257, 259, 128 N.E.2d 731.) Without considering the need for a double standard of legal representation, we will apply both Illinois standards to the case before us. See *People v. Johnson* (1977), 45 Ill. App. 3d 255, 257, 359 N.E.2d 791.

Application of the standard requires an examination of the entire record and a decision of each particular case as presented. The United States Supreme Court has pointed out that "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow." *McGautha v. California* (1971), 402 U.S. 183, 213, 28 L. Ed. 2d 711, 729, 91 S. Ct. 1454, quoting *McMann v. Richardson* (1970), 397 U.S. 759, 769, 25 L. Ed. 2d 763, 90 S. Ct. 1441.

The trial of a criminal case, especially with a jury, inevitably presents most trying and delicate situations. A multitude of complex problems may arise in even the simplest case. It is inherent in these situations that the minds of men can and will diverge regarding the proper tactics to be followed in any particular situation. The factors which may influence a jury are necessarily intangible and vague matters of individual opinion. All that any trial lawyer can do in these situations is to attempt to use his best judgment as dictated by the situation at any given time; often with only a brief second for thought or deliberation. Therefore, it has been frequently and consistently held that "[m]atters going to the exercise of counsel's judgment and discretion and trial tactics are insufficient to establish incompetence of counsel." *People v. Johnson* (1977), 45 Ill. App. 3d 255, 258, 359 N.E.2d 791, and cases there cited.

Careful consideration convinces us that virtually all of the points raised by counsel for defendant in this phase of the case before us should be rejected for that reason. The decisions made by defendant's trial counsel regarding the precise content of his opening statement; his alleged demonstration of unfamiliarity with firearms evidence while cross-examining a prosecution expert; his reference to his client as a "fool" in

closing argument; his failure to object to a number of the allegedly prejudicial prosecution arguments; his failure to request an instruction concerning defendant's right not to testify (IPI Criminal No. 2.04) and his argument to the jury regarding recovery of a bullet from the murder scene as being contrary to a stipulation between the parties regarding the chain of evidence (which stipulation was never read to the jury), each and all come within the scope of trial tactics. Under no circumstances should a decision made by a trial lawyer on any of these points be construed to constitute incompetence of counsel.

As to the remaining arguments by defendant, the alleged absence of trial counsel during part of the testimony of the firearms expert is not shown by the record to have any significance. Similarly, the absence of the trial attorney from the polling of the jury falls into the same category. In the latter instance, two attorneys from his office took his place. They performed the only function available to them, that of requesting that the jury be polled.

■■ This record demonstrates that defendant's trial counsel adequately and capably rendered all necessary legal services to defendant. He filed proper discovery motions, conducted a thorough cross-examination in every instance and, in short, gave defendant more than adequate representation. Judging this issue from "the totality of facts and circumstances of the case at bar * * *" (*People v. Monreal* (1976), 42 Ill. App. 3d 842, 848, 356 N.E.2d 921), we conclude that the legal representation which defendant received was sufficient by any and all of the standards above stated. We certainly cannot say that the representation was so inadequate as to reduce the proceedings to a sham or a farce, that this record reflects actual incompetence of counsel, or that the performance of trial counsel failed to meet a minimum professional standard. The lack of incompetence is fortified considerably by the fact that we have here no showing of substantial prejudice to defendant. On the contrary, as above indicated, the evidence of defendant's guilt was clear and convincing beyond any reasonable doubt. We cannot say that other legal services or the efforts of any other counsel would have aided defendant to an acquittal.

■■ We are necessarily cognizant of the argument of waiver repeated and reiterated by the State concerning defendant's arguments on denial of the motion to suppress, alleged improper final argument and the jury instruction on a confession. We agree with the State that, since these points were not raised specifically in defendant's written motion for new trial, they are waived. (See Ill. Rev. Stat. 1975, ch. 38, par. 116—1(c), and *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, and cases there cited.) However, under all of the circumstances shown by this

record, we have elected to consider each and all of these arguments on their merits.

It remains to consider the sentence of 50 to 100 years for murder. Defendant urges reduction of sentence upon the theory that defendant was previously convicted only of possession of narcotics and criminal trespass to a vehicle, both misdemeanors. The State asserts that defendant was also convicted of possession of narcotics, a felony, was put on probation for petty theft, and was found in violation of the Code of Military Justice for possession and sale of marijuana while in the army.

Turning our consideration to the crime itself, we expressly reject defendant's contention that a criminal sentence should invariably be reduced where guilt of the defendant rests upon the theory of accountability. Note *People v. Malcom* (1973), 14 Ill. App. 3d 378, 384-85, 302 N.E.2d 352, *appeal denied* (1973), 54 Ill. 2d 598.

■■ Although this court has express power to reduce the punishment imposed by the trial court (Ill. Rev. Stat. 1975, ch. 110A, par. 615(b)(4)), the restrictions upon this power have been stated so frequently as to eliminate the need for repetition here. (See *People v. Sprinkle* (1974), 56 Ill. 2d 257, 264, 307 N.E.2d 161, *cert. denied* (1974), 417 U.S. 935, 41 L. Ed. 2d 239, 94 S. Ct. 2650.) The experienced and able trial judge who entered this sentence was in better position than this court to make a proper determination of the punishment to be imposed. Also, under applicable law, this defendant will be eligible for parole 20 years after his original incarceration. (Ill. Rev. Stat. 1975, ch. 38, par. 1003—3—3(a)(1).) Good behavior could reduce this minimum to 11 years and 3 months. The request for reduction of sentence is accordingly denied.

■■ As regards the conviction for attempt armed robbery, the court imposed no sentence. The single sentence imposed by the court is manifestly inapplicable to the conviction for attempt armed robbery which is a Class 2 felony. (See Ill. Rev. Stat. 1975, ch. 38, pars. 8—4(c)(2), 1005—8—1(b)(3), 1005—8—1(c)(3).) Since the trial court entered no sentence upon the conviction for attempt armed robbery, the judgment of conviction as to that offense will be vacated. *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.

Affirmed in part and vacated in part.

McGLOON and O'CONNOR, JJ., concur.